ARTHUR E. SQUIRE ET UX *v.*
RUSSELL L. SQUIRE ET AL

5-6055                                            486 S.W. 2d 910

Opinion delivered December 4, 1972

*Pearce, Robinson & McCord,* for appellants.

*Harper, Young & Smith,* for appellees.

GEORGE ROSE SMITH, Justice. This is essentially a dispute between the appellant Arthur E. Squire (and his wife Nancy) and Arthur's father, the appellee Russell L. Squire, about the father's accountability to the son for certain coal mining royalties paid to a family-owned corporation, Nancy Lee Coal Company, during a period of years while the father was actively in charge of the company's affairs. Arthur and Nancy brought this suit to obtain an accounting from the elder Squire and from the appellee Evans Coal Company, which was the lessee actually mining the coal and paying the royalties to the family corporation. The chancellor entered a decree finding that the plaintiffs were entitled to recover $14,-855.59 as their share of the royalties during the years in question. The plaintiffs, in appealing from the decree in their favor, submit alternative contentions by which they assert that their recovery should be either $47,657.08 or $22,789.34. There is no cross appeal.

The 626-page record and the abstracts and briefs involve many facts not pertinent to an understanding of the issues presented. The facts that we regard as controlling are either undisputed or very nearly so.

In 1947 the elder Squire, who was experienced in coal mining, and his son Arthur organized the corporation, Nancy Lee Coal Company, with equal stock ownership. Their explorations proved the existence of coal deposits underlying certain lands in Oklahoma. The corporation obtained coal leases upon the lands from the United States Commissioner of Indian Affairs, who had control of the lands. We are concerned only with Lease No. 5, which is still in force.

The Squires made no effort to mine the coal them-

selves. Instead, the family corporation assigned the leases to Evans Coal Company in 1950. Over a period of some twenty years Evans removed coal by the strip-mining process and paid royalties at an agreed rate to Nancy Lee Coal Company.

In 1951 differences arose between the father and son. By an agreed transfer of stock the father became the owner of 101 shares in the corporation, with the son owning the other 99 shares. (In 1964 Arthur gave his stock to his wife, but as they are co-plaintiffs we need not distinguish between their rights.)

On April 17, 1951, the father and son executed what we will refer to as The Contract, upon which this entire litigation actually centers. That agreement recited the parties' common desire to sell their stock in the Nancy Lee Coal Company and empowered the father, Russell Squire, to offer the entire 200 shares for sale. The stock was not to be sold within the first six months for less than $500,000. If no purchaser should be found within that period the parties were to agree upon a new minimum price. The net proceeds of sale, after certain deductions, were to be divided two thirds to the father and one third to the son.

The Contract provided that until such time as the stock was sold Arthur would receive, in lieu of any or all claims for salary or dividends, the sum of $75.00 per week during each month in which more than 7,000 tons of coal was produced from properties previously assigned to Evans Coal Company. In months in which the production was less than 7,000 tons Arthur was to receive only three cents for each ton produced.

Russell Squire never succeeded in selling the stock. As far as the record shows, he never even attempted to sell it. Instead, the Evans Coal Company continued to strip-mine the leased property and to pay royalties to Nancy Lee Coal Company. (Nancy Lee's corporate charter was actually canceled in 1958 for nonpayment of franchise

taxes, but none of the litigants have attached significance to that forfeiture.)

Arthur Squire duly received from his father the weekly or monthly payments under The Contract until March, 1964, when the payments stopped. In response to Arthur's inquiry his father, who was then living in California, informed him—apparently in good faith—that coal was no longer being mined. In 1967 Arthur learned that mining operations had not actually stopped. In 1969 he and his wife brought this suit for an accounting, resulting in the decree now on review. Two contentions for reversal are asserted.

First, the appellants argue that The Contract, as a result of Russell Squire's failure to accomplish its purpose by selling the Nancy Lee stock, terminated either in 1964, when the payments to Arthur stopped, or in 1967, when Russell purportedly sold the Nancy Lee assets to a company owned by Russell and his daughter and son-in-law. Upon the premise that The Contract actually terminated, the appellants insist that they are now entitled to $47,657.08, as a share in the post-1964 royalties proportionate to their 49.5% stock ownership in the family corporation. In that connection it is argued that Russell Squire wrongfully sold all the corporate assets in 1967 without complying with the procedure specified in Ark. Stat. Ann. § 64-803 (Repl. 1966).

We find no merit in that argument. In substance the appellants are seeking a forfeiture of Russell Squire's rights under The Contract. It is basic, however, that a court of equity abhors a forfeiture and will seize upon even slight circumstances that indicate a waiver of the right to declare a forfeiture. *Triplett* v. *Davis,* 238 Ark. 870, 385 S.W. 2d 33 (1964); *Berry* v. *Crawford,* 237 Ark. 380, 373 S.W. 2d 129 (1963).

Here the equities strongly favor Russell Squire. For thirteen years Arthur accepted payments under The Contract without complaining about his father's failure to sell the corporate stock. The appellants admit that their

conduct kept the contract in force far beyond what might otherwise have been a reasonable time for Russell Squire to find a buyer for the stock. Yet when the payments stopped in 1964, the appellants still delayed for five years before bringing this suit for an accounting. In that interval Arthur took no action, although even a slight investigation would have disclosed the truth with respect to the Evans Coal Company's mining activities and payment of royalties. At this late date a retroactive forfeiture would penalize the elder Squire for having disbursed royalty payments that Arthur was apparently not claiming any interest in. Such a forfeiture would disregard Arthur's remedy under The Contract, which required that a new minimum price for the stock be fixed by agreement. It would unduly favor Arthur, by investing him with about half the royalties when The Contract provided that he was to receive only one third of the net proceeds of sale of the assets. Upon the record as a whole, the chancellor was right in holding that The Contract was not terminated in 1964 or in 1967.

There is, however, merit in the appellants' alternative contention that they are entitled to judgment for $22,-789.34 instead of the lesser sum allowed by the decree. Upon this issue several additional facts must be taken into account.

The Evans Coal Company, after obtaining an assignment of Nancy Lee's Lease No. 5 in 1950, strip-mined the lands described in the lease for many years. By 1962 Evans had mined the vein of coal to the western edge of the leasehold lands. Next to the premises, still farther west, was a tract from which the coal had been extracted as completely as was possible by the underground mining process that was used. Evans obtained permission from the Department of Interior to strip the overburden from those adjacent lands and recover the coal that had been left as supporting pillars in the underground mines. A year later similar permission was obtained from the Government with respect to a tract still farther west. In both instances Evans and Squire, Sr., treated the new stripping operations as mere extensions of

Lease No. 5. No new agreement was entered into. Evans simply paid royalties to Squire (as the representative of the Nancy Lee Coal Company) at the rate specified in Lease No. 5. The president of the Evans Coal Company testified without contradiction that he considered the two new tracts to be mere extensions of Lease No. 5 and that he so treated them.

The chancellor found that the 1962 and 1963 extensions were distinct from Lease No. 5, so that the plaintiffs had no interest in the royalties derived from the extensions. That finding restricted the appellants to their share in the royalties upon coal produced after March, 1964, from the original Lease No. 5 lands. That production was so limited that the appellants' recovery was measured at least in part at the rate of three cents a ton, for a total award of $14,855.59. Had the two extensions been taken into account the appellants' measure of recovery would have been at The Contract rate of $75.00 a week, making a total of $22,789.34.

We disagree with the trial court's conclusion. It is undisputed that both Squire, Sr., and Evans treated the two extensions as parts of the original Lease No. 5, so that the appellants are prima facie entitled to share in the income derived from the extensions. The appellees, however, argue that The Contract precludes that view, because by its terms Arthur Squire accepted, in lieu of salary or dividends, $75.00 per week during each month that the Evans Coal Company's production "from coal properties previously assigned to it by the Nancy Lee Company" exceeded 7,000 tons per month.

We are unwilling to construe the contract so strictly or so inequitably, especially as it was apparently prepared by Russell Squire. The equities are clearly with the appellants. There is no suggestion whatever that Evans would have paid any royalties to Squire, Sr., from the extended premises, but for the fact that he represented the Nancy Lee Coal Company. It is obvious that Evans was not making a gift of thousands of dollars to Squire

or to Nancy Lee. We discern no basis in simple fairness for denying to the appellants their right to participate in the income accruing from the extensions. This conclusion works no hardship upon the elder Squire or his associates in their new company, for they received from the two extensions royalties far in excess of the additional $7,933.75 that will be recovered by the appellants.

The appellees also argue that the appellants, by accepting payment of the sums awarded to them by the court below, have enjoyed the benefits of the decree and therefore cannot question it. They have, however, accepted nothing that they were not entitled to receive under any possible disposition of the appeal; so they are not precluded from questioning the trial court's decree with respect to the additional recovery now being sought. *McCown* v. *Nicks,* 171 Ark. 260, 284 S.W. 739, 47 A.L.R. 332 (1926).

Reversed and remanded for the entry of a decree consistent with this opinion.